**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 19, 2012

No. 10-50726

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SYLVIA DELGADO,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before JONES, Chief Judge, and DAVIS and DeMOSS, Circuit Judges.
EDITH H. JONES, Chief Judge:

Sylvia Delgado was convicted by a jury of defrauding Medicaid and Medicare of $1.4 million. Delgado appeals her conviction, arguing that the evidence was insufficient; prejudicial evidence was admitted; the jury instructions were flawed; her sentencing level was erroneously increased for obstruction of justice; and the district court erred by denying Delgado's request for post-trial contact with a juror. Because there is sufficient evidence to support the conviction and no reversible error, we AFFIRM.

No. 10-50726

## BACKGROUND

Delgado, a self professed medical billing expert with thirty years of experience in medical coding and billing, owned a billing company called Med Comp Electronic Billing. In 1992, Delgado started doing billing and record work for Dr. Rafael Solis, a psychiatrist. In 2002, Delgado was approached by a Licensed Master Social Worker ("LMSW") named Robert Rael ("Rael") with a business idea of providing group psychotherapy counseling to the elderly. Rael's idea consisted of having a psychiatrist refer patients to Rael for group psychotherapy sessions. Delgado agreed to approach Dr. Solis with the idea, and the three formed Synergy in early 2002.

Dr. Solis, as a licensed psychiatrist, was the medical director of Synergy. He performed initial evaluations of patients, prescribed medication, and conducted individual counseling sessions. Dr. Solis referred the patients to Synergy for group psychotherapy, which was billed under his Medicaid and Medicare numbers even though he did not conduct or supervise the group sessions. Rael agreed to conduct the group therapy sessions using Dr. Solis's billing numbers because Rael was not authorized under Texas law to have his own billing numbers. Delgado performed all of the billing and split Synergy's Medicaid and Medicare billing proceeds with Rael. Rael received seventy percent of the proceeds and paid for operating expenses. Delgado received thirty percent of the proceeds. Dr. Solis was initially not paid by Synergy, but starting in January 2005, Synergy paid him $2,000 per month. Medicare and Medicaid paid $1.4 million for therapy conducted at Synergy from 2002 until 2005. In just over three years, Rael profited $508,953.10 and Delgado profited $388,059.20 from Medicaid and Medicare.

No.  10-50726

The "therapy" conducted at Synergy was ineligible for the Medicaid and Medicare payments that Rael and Delgado received.  While group psychotherapy can be billed to these programs, the sessions must meet stringent requirements. Multiple sessions for one patient in one day are usually prohibited. Consequently, Medicaid and Medicare billing systems automatically reject more than one group therapy code, 90853, per day per patient.  Delgado, through research and talking to other billing practitioners, learned how to circumvent this system using a modifier in conjunction with the billing code.  After discovering this modifier, Delgado billed up to six group therapy sessions per day per patient.  Medicare's program integrity contractor flagged Dr. Solis because his office billed the group therapy code 17,000 times in one year compared to his peer group's average of 500 claims.

Federal regulations also require that group psychotherapy be conducted by a state licensed psychiatrist, psychologist, or qualified mental health professional.  Rael, as a LMSW, is unqualified to conduct therapy sessions in Texas without supervision, and there is evidence that Delgado was told that Rael was not authorized to conduct these therapy sessions.  Non-physician providers can conduct therapy "incident to" treatment provided by a physician if the following supervision requirements are met: the doctor must be actively involved in the patients' care, the doctor must be on the premises, and the doctor must be available to assist the patients during treatment.  Dr. Solis admitted to investigators that he did not supervise the therapy at Synergy.  Indeed, Dr. Solis

No. 10-50726

worked most of the time at his office in San Antonio,[1] for the Social Security Administration, the Texas Rehabilitation Center, and the GEO prison center.

In reality, Rael was not even conducting most of the therapy but instead spent seventy-five percent of the "therapy" time alone in his office. Robert Martinez, who has a sixth grade education, conducted most of the sessions. Martinez picked up the patients around 12:30 p.m. on weekdays and brought them to Synergy, where they would sign an attendance log, watch television, talk to each other, and eat doughnuts for the first hour. The "therapy" consisted of watching television, eating meals, socializing, being read to, playing loteria, and celebrating birthdays. For these activities, Delgado billed Medicaid and Medicare up to six group psychotherapy sessions per day per patient. Unsurprisingly, the regulations prohibit describing the following as group therapy: social activities, socialization, music therapy, recreational activities, art classes, excursions, cognitive stimulation, motion therapy, and eating together. What Synergy did is billable to the programs, if at all, as adult day care, which is reimbursed at a much lower rate and for no more than two units per day. Synergy did not even qualify for adult day care, however because it failed to furnish nursing staff, personal care services, and physical therapy services.

Delgado was frequently present at the Synergy office during this "therapy." Initially, Delgado occupied an office in the same suite as Synergy. She moved two doors down to another suite of offices as Synergy expanded but continued to visit the Synergy to collect sign in sheets, talk to Rael, and attend birthday parties. When Dr. Solis was in town, Delgado escorted patients to

---

[1] San Antonio is nearly three hours drive away from Synergy, which is located in Del Rio, Texas.

4

No. 10-50726

Dr. Solis's office for individual counseling. Despite her proximity and frequent visits to Synergy, she billed for group psychotherapy when both Rael and Dr. Solis were out of town or out of state and even on a holiday. Delgado's involvement with Synergy was not limited to her visits and the billing. She was a founder of the company, received thirty percent of the billing proceeds, and exerted influence over the operation of Synergy when she forced Rael to fire an employee.

In May 2005, Medicare's integrity contractor, Tri-Centurion, began investigating Synergy's billing practices. In response, Rael, Dr. Solis, and Delgado consulted a lawyer and sent a statement to the investigators that Dr. Solis supervised all of the sessions and the group therapy was legitimate. Delgado and Rael also arranged to have the patients submit, as affidavits, their handwritten copies of a statement that Delgado wrote. A witness testified that she helped Delgado change words in some of the statements so they would not all be exactly the same but would all still claim that Rael conducted legitimate group psychotherapy sessions. After these affidavits were submitted, a criminal investigation began. When Delgado knew federal investigators were going to interview Dr. Solis, she advised him: "[p]lease do not give them too much information only whatever questions they might want answered as you already know." After Rael's arrest, Delgado tried to get a message to Rael through a relative telling him to "stick to their stories."

Based on the investigation, a grand jury returned a ten-count indictment against Delgado.[2] A jury found Delgado guilty on all counts. She was sentenced

---

[2] Rael was indicted, pled guilty, and testified for the government at trial. Dr. Solis was indicted, but the jury acquitted him of all but three false statements charges.

No.  10-50726

to 51 months in prison and ordered to pay $1,411,203.08 in restitution. Delgado's prison sentence included a two-step increase for obstruction of justice because of Delgado's improper contact with a juror.  Delgado appeals her conviction and sentence.

## DISCUSSION

### A. Sufficiency of the Evidence

Delgado argues that there is insufficient evidence to support her conviction for health care fraud, conspiracy, and making false statements.  When reviewing jury verdicts, "the standard of review is whether, after viewing all the evidence and inference that may be drawn therefrom in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt."  *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009) (citing *United States v. Holmes*, 406 F.3d 337, 351 (5th Cir. 2005)).  "The jury is free to choose among reasonable constructions of the evidence and the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Ferguson*, 211 F.3d 878, 882 (5th Cir. 2000).  After reviewing the evidence, we find the evidence sufficient to support the conviction.

*1. Fraud and Making False Statements*[3]

Delgado contends that the evidence was insufficient to establish that she knew the therapy she was billing for was fraudulent.  Thus, she could not have

---

[3] The criminal conduct at issue is codified at 18 U.S.C. §§ 1035 and 1347.  The former provision concerns making false statements or representations in connection with the payment of health care benefits and the latter concerns defrauding any health care benefit program. Both provisions require proof that the defendant acted knowingly and willfully.

No. 10-50726

had the requisite mens rea to commit fraud or make false statements. We disagree.

First, because of her ownership and involvement in Synergy and her schedule-keeping for Dr. Solis, Delgado knew he could not be conducting or personally supervising the therapy. Second, there was abundant evidence of Delgado's knowledge that "therapy" at Synergy was nothing more than adult day care conducted by a man with a sixth grade education. Third, knowing that the Medicaid and Medicare billing systems would reject more than one group psychotherapy session per day, Delgado researched how to get around that feature by perusing the federal manuals, consulting other billing professionals, and trial and error. The jury could have concluded from this that she should have known that something was wrong with her billing method. Fourth, Delgado billed for days when she knew Rael and Dr. Solis were out of town and even on a holiday.

Finally, the evidence shows that Delgado knew these practices were against federal guidelines. She is a medical billing expert with thirty years experience who received continual updates from Medicaid and Medicare. She had to research how to evade the billing system and highlighted newsletters that showed Synergy was in violation of the regulations. She was also told by investigators that Synergy's practices were illegal but continued to engage in them.

From this and other evidence, the jury could readily infer her criminal intent to commit healthcare fraud and make false statements relating to health care matters.

No.  10-50726

*2. Conspiracy*

To prove conspiracy to commit healthcare fraud, violating 18 U.S.C. § 1349, the government must establish the existence of an agreement between two or more people to pursue the offense of fraud; the defendant knew of the agreement; and the defendant voluntarily participated in the conspiracy. *See United States v. Montgomery*, 210 F.3d 446, 449 (5th Cir.2000). "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Garza-Robles*, 627 F.3d 161, 168 (5th Cir. 2011) (quoting *United States v. Mitchell*, 484 F.3d 762, 768-69 (5th Cir.2007)).  Delgado argues that there is insufficient evidence to convict her under each of these elements.  Her strongest argument is that the three participants did not intend to run Synergy in violation of the law because Rael thought he could legitimately conduct therapy sessions. She contends they did not learn otherwise until they were confronted by investigators.

Despite this claim, there is sufficient evidence for a rational jury to conclude that Delgado and Rael agreed to fraudulently bill Medicaid and Medicare.  First, regardless of their allegedly benign motives for forming Synergy, the program soon began billing substantial amounts of money to Medicare and Medicaid for activities that obviously fell short of reimbursable group psychotherapy. Second, Delgado negotiated a generous cut of the profits for herself considering her allegedly limited duties.  Third, she knew the applicable regulations and had to work hard to find a way to get around the billing system in order to bill up to six sessions per day per patient.  As a result, she billed Medicaid and Medicare over a million dollars for ineligible "therapy" and received over $130,000 per year while the scheme existed.  After the

8

investigation began, she encouraged her co-conspirators to stick to their stories and to give as little information to the investigators as possible.  In sum, the circumstantial evidence, coupled with testimony of Rael and Martinez, supports the jury's conclusion that Delgado participated in a conspiracy to defraud Medicare and Medicaid.

**B. Admission of Medicaid and Medicare Newsletters and Manuals**

Delgado argues that the admission of Medicaid and Medicare newsletters, manuals, and other reference materials was harmful error because the publications were irrelevant to her state of mind and posed the risk of turning regulatory violations into a criminal offense in the minds of the jury.  This court reviews evidentiary decisions by the trial court for abuse of discretion.  *United States v. Hicks*, 389 F.3d 514, 522 (5th Cir. 2004).  "Even where the district court erroneously admitted prejudicial evidence, the defendant's conviction will not be reversed if the error was harmless."  *Id.*

The government points to Eleventh Circuit case law where healthcare manuals were found to be relevant.  In *United States v. Gold*, 743 F.2d 800, 815 (11th Cir. 1984), the Eleventh Circuit stated:

> Under FED. R. EVID. 401 and 402, the basic test governing admissibility is that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  By this standard, there can be little question that the provisions of the Carrier's Manual were admissible.

In the instant case, the government had to prove that Synergy's billing practices were unauthorized by regulation.  The manuals and newsletters were relevant to that determination.  The government also established that newsletters were mailed to Delgado by introducing newsletters discovered in her office with

mailing labels still attached.  Delgado told investigators that she "glanced over" newsletters and highlighted pertinent sections and provided investigators with excerpts from newsletters that she had highlighted.  One of these newsletters, however, was conspicuously missing the page that indicated that Synergy's "therapy" was ineligible for reimbursement.

Additionally, Delgado's promotional brochure boasted that she kept up with the frequent updates in government regulations.  Because Delgado had access to the regulatory publications and had read at least some of them, the material was also relevant because it increased the probability that Delgado knew her billing practices were illegal.

The district court, cognizant of the danger of the jury's misusing the regulatory material, gave the following instruction during the jury charge:

> You have heard evidence about the various Medicare and Medicaid rules and regulations and manuals, excerpts of the manuals, newsletters, state statutes, and copies of those items have been received as exhibits in this trial.  You are advised, however, that any potential violations of those rules and/or regulations and/or state statutes by any of the defendants are not sufficient in and of themselves to prove the charges alleged in the indictment.  The government's burden is to prove the elements of the offense alleged beyond a reasonable doubt as defined in these instructions.

We assume the jury followed this careful instruction.  The district court did not abuse its discretion by admitting these materials with the limiting instruction.

## C. Deliberate Indifference Instruction

Delgado claims the district court abused its discretion by giving a deliberate indifference instruction that relieved the government of having to prove her actual knowledge of the wrongdoing.  This court reviews jury instructions to determine "whether the court's charge, as a whole, is a correct statement of law and whether it clearly instructs the jurors as to the principles

No.  10-50726

of law applicable to the factual issues confronting them." *United States v. Moreno*, 185 F.3d 465, 476 (5th Cir. 1999) (citations omitted).  This court should review whether the charge is supported by fact under the abuse of discretion standard.  *United States v. Nguyen*, 493 F.3d 613, 619 (5th Cir. 2007).  "When examining whether the evidence sufficiently supports the court's charge, we must view the evidence and all reasonable inferences therefrom in favor of the government."  *Moreno*, 185 F.3d at 476.

The Fifth Circuit consistently upholds instructions of deliberate ignorance if they have the required factual basis.  *Moreno*, 185 F.3d at 476.  The instruction is only warranted "when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference."  *Id.* (quoting *United States v. Posada-Rios*, 158 F.3d 832, 875 (5th Cir. 1998)).  "The evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct."  *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990).  The court errs in giving the instruction if the defendant does not claim a lack of guilty knowledge.  *Id.*

After reviewing the record, we are assured that the district court did not abuse its discretion.  Delgado's defense relied on her claiming ignorance of wrongdoing and the two inferences were raised at trial.  First, there is ample support for her subjective awareness of the wrongdoing, as shown by the above recitation of evidence.  Second, the evidence equally supports that she purposefully contrived to avoid learning of illegal conduct.  Delgado sought advice from other Medicaid and Medicare experts but asked selective questions

11

that obfuscated Synergy's wrongdoing.  Also, she highlighted newsletters for Rael and Dr. Solis but excluded pages, and claims she did not read them, that contained standards Synergy violated.  The district court did not abuse its discretion by giving the deliberate indifference jury instruction.

## D. Obstruction of Justice

Delgado argues that the district court judge erred by enhancing her base offense level for obstruction of justice.  Specifically, Delgado claims that because she self-reported her contact with the juror, she could not have been willfully trying to obstruct justice.  This court reviews *de novo* the district court's interpretation of the sentencing guidelines, and factual findings are reviewed for clear error.  *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008).  The district court's finding is not clearly erroneous if it is plausible in light of the whole record.  *Id.*  Further, "[t]he clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses."  *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005).

A review of trial and sentencing transcripts confirms that the court did not clearly err by enhancing Delgado's sentence level.  Although Delgado heard the court's express and repeated warnings not to talk to the jurors at any time, she began talking to a juror anyway.  She told the juror "we still have a check for you in the office," referencing a tax refund check that her brother, an accountant, had for the juror.  Delgado startled the juror by using a formal name the juror only used on official documents like tax returns.  The district court found that Delgado had been playing games with the jury and that Delgado was communicating to this juror, a member of an anonymous jury, that she knew her

identity.    This evidence renders the court's credibility choice more than plausible.

## E. Denial of Delgado's Motion to Contact and Interview a Juror

Delgado argues that the district court abused its discretion and violated her Sixth Amendment rights by denying her the opportunity to contact a juror after the trial.  This court reviews the district court's decision to deny a post-trial interview of a juror for abuse of discretion.  *Salinas v. Rodriguez*, 963 F.2d 791, 794 (5th Cir. 1992).  "The duty of the trial court, when jury misconduct is alleged after the trial, 'must be judged on the peculiar facts and circumstances of each case.'" *Id.* at 795 (quoting *United States v. Sedigh*, 658 F.2d 1010, 1014 (5th Cir. 1981)).  Moreover, jurors under oath are presumed to have faithfully performed their official duties.  *United States v. Eldred*, 588 F.2d 746, 752 (9th Cir. 1978).

Delgado asserts that one of the jurors worked at the same correctional facility where Dr. Solis sometimes provided inmate psychiatric care.  Because she contends the juror may have lied about this connection to Dr. Solis during voir dire, she desired to contact the juror after the trial.  The judge denied Delgado's motion.  Given the inappropriate contact with a juror at trial, who may be the same juror Delgado wanted to contact post-trial, the judge was justified in its denial.  In any event, there is no evidence that the juror was guilty of misconduct.  This court does not assume that jurors lie in response to questions during voir dire.  *United States v. Masat*, 896 F.2d 88, 95 (5th Cir. 1990).  Because Delgado offered no evidence of juror misconduct, the judge was within her discretion to deny the motion.

No.  10-50726

## CONCLUSION

For the reasons stated, we conclude that the evidence was sufficient to convict Delgado on all counts.  On all of her other claims we find that no error or no reversible error was committed by the district court.  AFFIRMED.